# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DENISE SOBILO f/k/a )
IMAN SELEMAN, )
                   )
       **Plaintiff,** )
                   )
       **v.** )     **No. 06 C 543**
                   )
**LAWRENCE S. MANASSA,** )     **Judge Ruben Castillo**
**RIFFNER, BARBER, ROWDEN** )
**& SCOTT, LLC., a law firm,** )
**and THOMAS M. GUREWITZ,** )
                   )
       **Defendants.** )

## MEMORANDUM OPINION AND ORDER

Denise Sobilo f/k/a Iman Seleman ("Plaintiff") filed this legal malpractice suit, premised

on diversity jurisdiction, against Defendants, attorney Lawrence S. Manassa and his law firm

(referred to collectively as "Defendant Manassa") and attorney Thomas M. Gurewitz ("Defendant

Gurewitz"), both of whom represented her in an Illinois divorce proceeding. Plaintiff claims that

Defendants' negligent handling of the divorce allowed her ex-husband to dissipate nearly $2

million in assets and flee to Egypt. (R. 1, Compl. ¶¶ 4-24.) Before the Court are separate

summary judgment motions filed by Defendant Manassa and Defendant Gurewitz. For the

following reasons, the motions are denied.

### RELEVANT FACTS[1]

## I.    Factual Background

---

[1] These facts are derived from the parties' statements of facts and exhibits filed in support thereof pursuant to Local Rule 56.1. Unless otherwise indicated, the facts contained herein are undisputed.

Defendant Manassa and Defendant Gurewitz are attorneys licensed to practice law in Illinois. (R. 77, Pl.'s Resp. to Def. Manassa's Facts ¶ 2; R. 79, Pl's Resp. to Def. Gurewitz's Facts ¶ 4.) Plaintiff is a citizen of the State of Indiana. (R. 79, Pl's Resp. to Def. Gurewitz's Facts ¶ 1.)

In 1984, Plaintiff[2] married Hamed Seleman ("Hamed"), an Egyptian national, in a religious ceremony held in Chicago, Illinois. (R. 77, Pl.'s Resp. to Def. Manassa's Facts ¶ 5; R. 61, Def. Manassa's Facts, Ex. K (Judgment for Dissolution of Marriage dated Dec. 16, 2005 ("Divorce Judgment")) at 2.) During their marriage, the couple had four sons: Yusef, born in 1985; Amir, born in 1987; Omar, born in 1989; and Zakariya, born in 1992. (R. 61, Def. Manassa's Facts, Ex. K (Divorce Judgment) at 2.) In addition to the religious ceremony, the couple went through a civil marriage ceremony sometime around the birth of their youngest son. (R. 77, Pl.'s Resp. to Def. Manassa's Facts ¶ 5; R. 55, Def. Gurewitz's Facts, Ex. G (Sobilo's Dep. Tr.) at 18.)

During the marriage, Hamed owned several pieces of real property, including properties located at 5140 King Drive, Chicago, Illinois ("the King Drive property"); 3553 West Irving Park Road, Chicago, Illinois ("the Irving Park property"); and an apartment building located at 3001-09 West 19th Street in Chicago, Illinois ("the West 19th property"). (R. 61, Def. Manassa's Facts, Ex. K (Divorce Judgment) at ¶ 12; R. 91, Def. Manassa's Resp. to Pl's Add. Facts ¶ 14.) The parties dispute whether these properties were acquired during the marriage, a key issue for determining whether they constitute marital property. (See R. 90, Def. Gurewitz's Resp. to Pl's

---

[2] Plaintiff assumed the Egyptian name Iman Seleman at the time of her marriage. In the course of the divorce proceeding, she resumed the use of her maiden name, Denise Sobilo. (R. 55, Def. Gurewitz's Facts, Ex. G (Sobilo's Dep. Tr.) at 20-21.)

Add. Facts ¶¶ 16-17, 29). The divorce court found that the properties were acquired during the marriage. (R. 61, Def. Manassa's Facts, Ex. K (Divorce Judgment) at ¶¶ 12, 27.) Plaintiff has presented additional evidence that the Irving Park and King Drive properties were acquired in 2000, while she and Hamed were married. (R. 77, Pl.'s Resp. to Def. Manassa's Facts, Ex. 1 (Trustee's Deed) and 2 (Closing Statement).)

Hamed also owned a number of businesses during the marriage, including King Soliman Entertainment, Nefertiti Café, Sphinx International, Sphinx, Inc., Green Oak Management (which managed and collected rent on the King Drive property), Stone Reach Management, and Drexel Apartments. (R. 61, Def. Manassa's Facts, Ex. K (Divorce Judgment) at ¶¶ 27-28; R. 91, Def. Manassa's Resp. to Pl's Facts ¶¶ 15, 26.) Defendant Gurewitz admits that King Soliman Entertainment and Nefertiti Café were started during the marriage, but disputes whether the other businesses were started during the marriage. (See R. 90, Def. Gurewitz's Resp. to Pl's Add. Facts ¶¶ 16-17, 29). The divorce court found that all of the businesses specified above were acquired during the marriage. (R. 61, Def. Manassa's Facts, Ex. K (Divorce Judgment) at ¶¶ 12, 27.) Plaintiff did not work outside the home during most of the marriage. (R. 55, Def. Gurewitz's Facts, Ex. G (Sobilo's Dep. Tr.) at 17-19.)

In October 2001, Plaintiff filed a petition for dissolution of marriage in Lake County, Illinois (the "2001 proceeding"). (R. 79, Pl's Resp. to Def. Gurewitz's Facts ¶ 7.) She retained attorney Stuart Gordon (a non-party to this litigation) to represent her. (Id.) On the same day the petition was filed, Gordon obtained a temporary restraining order prohibiting Hamed from transferring any marital assets. (R. 55, Def. Gurewitz's Facts, Ex. J (Report of Benjamin P. Hyink ("Hyink's Report") at 9.) Shortly after the case was filed, Plaintiff and Hamed reconciled,

3

and the case was dismissed.

In June 2002, Plaintiff retained Defendant Manassa to file a second action for dissolution of marriage in Lake County ("the 2002 proceeding"). (R. 79, Pl's Resp. to Def. Gurewitz's Facts ¶ 9.) The petition alleged that Hamed had "dissipated marital income and assets, for which he should compensate and reimburse the marital estate." (R. 61, Def. Manassa's Facts, Ex. D (Petition for Dissolution of Marriage, filed June 14, 2002 ("2002 Petition") at ¶ 18.) Defendant Manassa also obtained a temporary restraining order prohibiting Hamed from transferring marital assets and requiring him to turn over his passport. (R. 77, Pl.'s Resp. to Def. Manassa's Facts ¶¶ 8-11; R. 55, Def. Gurewitz's Facts, Ex. J (Hyink's Report) at 9-10.) A few months after the case was filed, Plaintiff and Hamed again reconciled, and the case was dismissed. (R. 79, Pl.'s Resp. to Def. Gurewitz's Facts ¶ 10; R. 55, Def. Gurewitz's Facts, Ex. G (Sobilo's Dep. Tr.) at 39.)

Between April and September 2003, Hamed made a series of wire-transfers to Egypt totaling approximately $50,000. (R. 61, Def. Manassa's Facts, Ex. K at Ex. F (Wire Transfer History Provided by Foster Bank ("Wire Transfer History")); R. 91, Def. Manassa's Resp. to Pl's Add. Facts ¶ 31; R. 90, Def. Gurewitz's Resp. to Pl.'s Add. Facts ¶ 34; R. 55, Def. Gurewitz's Facts, Ex. P (Wire Transfer Records).) During this period, Hamed also sold the West 19th Street property and received net proceeds of approximately $600,000. (R. 61, Def. Manassa's Facts, Ex. K (Divorce Judgment) at ¶ 13.)

In September 2003, Plaintiff filed a third action for dissolution of marriage in Lake County ("the 2003 proceeding") and was again represented by Defendant Manassa. (R. 77, Pl.'s Resp. to Def. Manassa's Facts ¶ 14; R. 79, Pl's Resp. to Def. Gurewitz's Facts ¶ 11.) Plaintiff

4

did not pay a new retainer before the 2003 petition was filed.[3] (R. 61, Def. Manassa's Facts, Ex. C (Manassa's Dep. Tr.) at 54-55.) The 2003 petition again alleged that Hamed had "dissipated marital income and assets, for which he should compensate and reimburse the marital estate." (R. 61, Def. Manassa's Facts, Ex. G (Petition for Dissolution, filed Sept. 23, 2003 ("2003 Petition")) at ¶ 18.) During October 2003, Hamed continued to make wire-transfers to Egypt totaling approximately $300,000. (R. 91, Def. Manassa's Resp. to Pl's Facts ¶ 31; R. 90, Def. Gurewitz's Resp. to Pl.'s Facts ¶ 34; R. 55, Def. Gurewitz's Facts, Ex. P (Wire Transfer Records).)

In November 2003, Defendant Manassa filed a motion for a temporary restraining order enjoining Hamed from dissipating the marital assets.[4] (R. 61, Def. Manassa's Facts, Ex. C (Manassa's Dep. Tr.) at 66-67; R. 55, Def. Gurewitz's Facts, Ex. J (Hyink's Report) at 2.) After a hearing on Plaintiff's motion, the court entered the following order by agreement of the parties:

> Each party shall be enjoined from spending, transferring, encumbering, hiding or otherwise hypothecating any marital property (or personal or business property) or transferring money from any accounts, except for monies necessary for reasonable living expenses. This provision does not seek to freeze any accounts, or bar either party from using funds necessary for their (and their childrens) day to day needs, and for their normal course of business.

(R. 55, Def. Gurewitz's Facts, Ex. E (State Court Order, dated Nov. 19, 2003) ("the November

---

[3] The parties dispute whether Plaintiff formally "re-retained" Defendant Manassa to represent her in the 2003 proceeding or whether the 2003 case was merely a continuation of his representation in the 2002 case. (R. 79, Pl.'s Resp. to Def. Gurewitz's Facts ¶ 11; R. 77, Pl's Resp. to Def. Manassa's Facts ¶ 14.)

[4] We note that the motion for a temporary restraining order has not been included in the documents before us. Both parties reference the motion in their filings, and Hyink's report indicates that he reviewed the motion, filed November 5, 2003, in the context of rendering an opinion in the case. (R. 55, Def. Gurewitz's Facts, Ex. J (Hyink's Report) at 2.)

2003 Order").) Defendant Manassa did not serve this order on any of the financial institutions where Hamed held accounts. (R. 77, Pl.'s Resp. to Def. Manassa's Facts ¶ 26.)

On November 26, 2003, less than a week after the entry of the court's November 2003 order, Hamed granted a second mortgage of $400,000 on the Irving Park property to a third party, Sami M. Rageb. (R. 61, Def. Manassa's Facts, Ex. K (Divorce Judgment) at ¶ 18 & Ex. A (Junior Mortgage).) Although the matter is disputed by Defendant Manassa (but not Defendant Gurewitz), Plaintiff claims that Hamed made additional wire transfers to Egypt totaling approximately $750,000 sometime before the end of 2003. (*See* R. 91, Def. Manassa's Resp. to Pl.'s Add. Facts ¶ 35; R. 59, Def. Gurewitz's Chronology at 2.)

On January 16, 2004, Plaintiff retained Defendant Gurewitz to represent her.[5] (R. 79, Pl's Resp. to Def. Gurewitz's Facts ¶ 12.) On January 29, 2004, Hamed made a wire transfer of approximately $250,000 to Egypt. (R. 91, Def. Manassa's Resp. to Pl's Add. Facts ¶ 31; R. 90, Def. Gurewitz's Resp. to Pl's Add. Facts ¶ 34.) On February 3, 2004, Defendant Gurewitz formally filed his appearance in the case. (R. 79, Pl.'s Resp. to Def. Gurewitz's Facts ¶ 13.) Defendant Manassa remained counsel of record until that date. The following month Defendant Gurewitz filed a motion for temporary relief on Plaintiff's behalf in which he alleged, among other matters, that Hamed had "closed all the parties' joint accounts, dissipated other substantial assets, and stopped supporting the family." (R. 61, Def. Manassa's Facts, Ex. N (Petition for Temporary Relief filed March 3, 2004), at ¶ 12). The motion requested that Hamed be ordered to

---

[5] There is a dispute about precisely when Plaintiff terminated Defendant Manassa. (*See* R. 77, Pl.'s Resp. to Def. Manassa's Facts ¶ 27.) At her deposition Plaintiff testified that she was "guessing" it was sometime in December 2003. (R. 55, Def. Manassa's Facts, Ex G (Sobilo's Dep. Tr.) at 138.)

return a vehicle to Plaintiff and pay various family expenses, but did not seek any specific relief related to freezing Hamed's bank accounts. (*See id.* at 5-6.)

On July 9, 2004, Plaintiff sent a letter to Defendant Gurewitz terminating him. (R. 79, Pl.'s Resp. to Def. Gurewitz's Facts ¶ 14; R. 61, Def. Manassa's Facts, Ex. I (Letter to Thomas Gurewitz dated July 9, 2004.) Defendant Gurewitz's motion for leave to withdraw was granted on July 30, 2004. (R. 79, Pl.'s Resp. to Def. Gurewitz's Facts ¶ 15.) Plaintiff thereafter proceeded without counsel for several weeks. During this period, the King Drive property was sold pursuant to court order for $2.5 million. (R. 61, Def. Manassa's Facts, Ex. K (Divorce Judgment) at ¶¶ 14, 15.) The net proceeds totaled only $7,000 after payment of numerous liens on the property. (*Id.* ¶¶ 16.) In late August and early September 2004, Hamed made additional wire transfers to Egypt totaling approximately $350,000. (R. 91, Def. Manassa's Resp. to Pl.'s Add. Facts ¶¶ 31; R. 90, Def. Gurewitz's Resp. to Pl.'s Add. Facts ¶ 34-35.)

In September 2004, Plaintiff retained attorney Mari-Jo Jacquette ("Jacquette") to represent her. (R. 61, Def. Manassa's Facts, Ex. H (Suppl. App. of Mari-Jo Jacquette dated Sept. 14, 2004.) Jacquette is not a party to this litigation. Jacquette filed her appearance on September 14, 2004, along with an emergency motion requesting that Hamed be found in contempt for violating the November 2003 order. (R. 61, Def. Manassa's Facts, Ex. S (Emergency Petition for Rule to Show Cause, filed Sept. 14, 2004).) Jacquette submitted documentation showing that Hamed had improperly wire-transferred money in violation of the November 2003 order and argued that there was a risk he would continue to dissipate the marital assets. (*Id.* ¶ 14 & Ex. C. ) Among other relief, the motion requested that Hamed's accounts be frozen, that he be found in contempt, and that he be jailed for six months as punishment for his "wilful and contemptuous

7

conduct." (*Id.* at 6.)

In response to the motion, with Hamed present, the court entered an order freezing Hamed's accounts, issued a rule to show cause why Hamed should not be held in contempt, and set the matter for further hearing. (R. 61, Def. Manassa's Facts, Ex. T (State Court Order, dated Sept. 14, 2004).) After leaving court that day, Hamed initiated a wire transfer of approximately $115,000 to Egypt. (*See* R. 61, Def. Manassa's Facts, Ex. K (Divorce Judgment) ¶¶ 20-21 & Ex. F (Wire Transfer History); R. 91, Def. Manassa's Resp. to Pl.'s Facts ¶ 32; R. 90, Def. Gurewitz's Resp. to Pl's Facts ¶ 36.) On that same day, Hamed also quit-claimed the Irving Park property to Sami M. Rageb. (R. 61, Def. Manassa's Facts, Ex. K (Divorce Judgment) ¶ 22 & Ex. B (Quit Claim Deed).)

Hamed appeared in court on at least one other occasion, September 28, 2004. (R. 55, Def. Gurewitz's Facts ¶ 24 & Ex. I (State Court Order dated Sept. 28, 2004.) Sometime thereafter Hamed's counsel withdrew; he then obtained another attorney, who withdrew some months later. (R. 61, Def. Manassa's Facts, Ex. K (Divorce Judgment) at 1.) Eventually Hamed stopped appearing at scheduled court hearings, and the court found him in default. (R. 61, Def. Manassa's Facts, Ex. K (Divorce Judgment) at 1.) Hamed's present whereabouts are unknown, although Plaintiff suspects he is living in Egypt. (R. 55, Def. Gurewitz's Facts, Ex. G (Sobilo's Dep. Tr.) at 35.)

On December 16, 2005, the court entered a judgment of dissolution of marriage in Hamed's absence. (R. 61, Def. Manassa's Facts, Ex. K (Divorce Judgment).) Among other relief, the court: awarded Plaintiff sole custody of the children; ordered Hamed to pay $4,000 per month in child support and a lump sum of $30,100 in past due child support; awarded Plaintiff

$746,549.18, representing funds Hamed had transferred to Egypt in violation of the November 2003 order; awarded Plaintiff sole interest in the Nefertiti Café; ordered Hamed to pay Plaintiff $22,700 for failing to comply with discovery orders; and awarded Plaintiff $20,000 in attorneys' fees. (*Id.* ¶¶ A-V.) It is undisputed that Plaintiff has been unable to collect on the judgment. (R. 79, Pl.'s Resp. to Def. Gurewitz's Facts ¶¶ 36-37.)

## II. Procedural History

In January 2006, Plaintiff filed this action against the Defendants alleging that they negligently failed to prevent Hamed from dissipating the marital assets, precluding her from obtaining her share of those assets in the divorce.[6] (R. 1, Compl. ¶¶ 4-24.) She alleges that both attorneys breached their duty of care in several respects, including failing to serve copies of the November 2003 order on banks with which Hamed was known to hold accounts, and failing to record *lis pendens* notices with respect to the King Drive and Irving Park properties. (*Id.* ¶¶ 6-13.) According to Plaintiff, had Defendants acted diligently, Hamed would not have been able to dissipate her share of the marital assets and abscond to Egypt. (*Id.* ¶¶ 7, 18.)

Defendant Manassa and Defendant Gurewitz have filed separate motions for summary judgment. They raise several overlapping arguments. (R. 64, Def. Manassa's Mot. for Summ. J.;

---

[6] Plaintiff filed a separate suit before District Judge Virginia M. Kendall, *Sobilo v. Seleman, et al.*, 06 C 0461 (N.D. Ill. filed Jan. 25, 2006), against Hamed and several other individuals, including Sami M. Rageb ("Rageb"), all of whom are alleged to be Hamed's close associates. Plaintiff claims that the defendants engaged in a conspiracy to defraud her of her interests in the King Drive and Irving Park properties. (*Sobilo v. Seleman, et al.*, 06 C 0461, R. 71, First Am. Compl.). In October 2006, Plaintiff settled with Rageb; the claims against other defendants remain pending. (*Id.*, R. 63, Minute Order Granting Motion to Dismiss as to Defendant Rageb). According to the docket, Plaintiff is still attempting to effect service over Hamed and at least one other defendant. (*Id.*, R. 54, Minute Order Granting Motion for Extension of Time to Effect Service.)

R. 51, Def. Gurewitz's Mot. for Summ. J.) In his motion, Defendant Manassa argues that he is entitled to judgment because: (1) successor counsel Jacquette could have remedied the harm allegedly caused by his negligence and, thus, as a matter of law he was not the proximate cause of Plaintiff's injury; (2) he "did not have any evidence that would allow him to obtain a TRO stopping [Hamed] Seleman from transferring money to Egypt"; (3) Hamed's actions were not foreseeable; and (4) Plaintiff has not demonstrated that she suffered any actual damages as a result of his alleged negligence. (R. 66-2, Def. Manassa's Mem. in Supp. of Mot. for Summ. J. at 2-12.)

In his motion, Defendant Gurewitz adopts Defendant Manassa's arguments 3 and 4 related to foreseeability and actual damages. He also raises two additional arguments: (1) successor counsel Jacquette's own negligence "breaks the chain of causation and absolves Gurewitz of liability for any damages occasioned upon Plaintiff"; and (2) he is entitled to judgment because Plaintiff cannot prove the underlying divorce judgment "was or is collectible." (R. 53, Def. Gurewitz's Mem. in Supp. of Mot. for Summ. J. at 1, 2-9.) Defendant Manassa joins in Defendant Gurewitz's argument 2 related to collectibility of the underlying judgment. (*See* R. 66-2, Def. Manassa's Mem. in Supp. of Mot. for Summ. J. at 12.)

Alternatively, Defendant Gurewitz moves for partial summary judgment as to certain of Plaintiff's claims. Specifically, he argues that his failure to file a *lis pendens* notice was not the proximate cause of Plaintiff's damages with respect to the Irving Park property, and further, that he cannot be held responsible for any wire transfers that occurred prior to January 16, 2004, the date upon which he became Plaintiff's counsel. (R. 53, Def. Gurewitz's Mem. in Supp. of Mot. for Summ. J. at 10-15.) We will address each of these arguments in turn.

## LEGAL STANDARDS

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the Court must "construe all facts in the light most favorable to the nonmoving party and draw all reasonable and justifiable inferences in favor of that party." *King v. Preferred Tech. Group*, 166 F.3d 887, 890 (7th Cir. 1999). Summary judgment is not appropriate if there are disputed issues of fact remaining, or if the court must make "a choice of inferences" arising from undisputed facts. *Harley-Davidson Motor Co., Inc. v. PowerSports, Inc.*, 319 F.3d 973, 989 (7th Cir. 2003). "The choice between reasonable inferences from facts is a function of a fact-finder, and when multiple reasonable inferences exist on a genuine issue of material fact, summary judgment will not be appropriate." *Id.*

## LEGAL ANALYSIS

Because this case is premised on diversity jurisdiction, Illinois substantive law applies. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Ocean Atlantic Dev. Corp. v. Aurora Christian Sch., Inc.*, 322 F.3d 983, 995 (7th Cir. 2003). Under Illinois law, to prevail on a claim of legal malpractice, the plaintiff must prove: (1) the existence of an attorney-client relationship giving rise to a duty on the part of the attorney; (2) a negligent act or omission by the attorney

11

constituting a breach of that duty; (3) proximate cause establishing that, but for the attorney's

negligence, the plaintiff would have prevailed in the underlying action; and (4) actual damages.

*Mihailovich v. Laatsch*, 359 F.3d 892, 905 (7th Cir. 2004). In these motions, Defendants focus on

issues related to causation and damages. We address first the arguments that are raised by both

Defendants.

## I.    Proximate Cause

### A.    Whether Successor Counsel Jacquette Cuts Off The Chain of Causation Such That Defendants Cannot Be Held Liable for Plaintiffs' Damages.

Defendants raise similar arguments that they are absolved from liability because successor

counsel, Mari-Jo Jacquette, was the last to represent Plaintiff and had means available to her to

remedy any injury caused by Defendants' alleged negligence. (R. 66-2, Def. Gurewitz's Mem. in

Supp. of Mot. for Summ. J. at 2-5; R. 53, Def. Gurewitz's Mem. in Supp. of Mot. for Summ. J. at

3-7.) In essence, Defendants are arguing that they were not the proximate cause of Plaintiff's

injury. As the Illinois Supreme Court has explained, the term "proximate cause" encompasses

two distinct requirements: cause in fact and legal cause. *Young v. Bryco Arms*, 821 N.E.2d 1078,

1085 (Ill. 2004). The first requirement, cause in fact, is established "when there is a reasonable

certainty that a defendant's acts caused the injury." *Id.* The second requirement, legal cause, is

established only if the defendant's conduct is "so closely tied to the plaintiff's injury that he

should be held legally responsible for it." *Id.* Proximate cause is ordinarily a fact-laden issue that

must be decided by the trier of fact. *Abrams v. City of Chicago*, 811 N.E.2d 670, 674 (Ill. 2004)

("[P]roximate cause is generally an issue of material fact in a negligence suit.").

In arguing that they should be absolved of liability for Plaintiff's injury as a matter of law,

Defendants rely on a line of Illinois cases beginning with *Land v. Greenwood*, 478 N.E.2d 1203 (Ill. App. Ct. 1985), a malpractice case involving successive representation by different attorneys. In *Land*, the first attorney represented plaintiff for several months but failed to effect service on several of the defendants. After he withdrew, Plaintiff hired a second attorney. Approximately four months after the second attorney was retained, the defendants were finally served. They moved to dismiss based on the delay in effecting service, and the court dismissed the case with prejudice. The plaintiff then sued the first attorney, but not the second, for legal malpractice. *Id.* at 1204-05.

Under this particular set of facts, the *Land* court held that the plaintiff could not state a claim for legal malpractice against the first attorney because "it is only a matter of speculation as to whether the suit would have been barred at the time defendant was discharged." *Id.* at 1205. In dismissing the underlying case, the court had concluded only that failure to effect service four months after the second attorney was obtained demonstrated a lack of diligence; there was no indication whether the court would have found a lack of diligence based on failure to effect service at the time the first attorney withdrew. *Id.* Further, the *Land* court observed that the second attorney had an absolute right to voluntarily dismiss the case and refile it, which would have prevented an involuntary dismissal with prejudice. *Id.* The bottom line in the *Land* court's view was that the plaintiff's cause of action was "viable" at the time of the first attorney's withdrawal, but was not viable when the second attorney "got through with it." *Id.* Thus, the plaintiff could prove no set of facts connecting the first attorney's conduct to any damages he had sustained. *Id.* at 1206.

In subsequent cases, Illinois courts have applied *Land* to bar malpractice claims where it

13

could not be proven that the first attorney was the proximate cause of the plaintiff's damages. *See Mitchell v. Schain, Fursel & Burney, Ltd.*, 773 N.E.2d 1192 (Ill. App. Ct. 2002) (first attorney was not the proximate cause of plaintiff's damages even though dismissal resulted from his failure to prosecute the case; Illinois statute allowed successor attorney sufficient time to reinstate plaintiff's case, which he inadvertently failed to do); *Cedeno v. Gumbiner*, 806 N.E.2d 1188 (Ill. App. Ct. 2004) (applying *Land* to hold that trial court's acceptance of legally unsound basis for granting summary judgment served as an intervening cause absolving former attorneys for negligent handling of client's case).

Defendants argue that pursuant to this line of cases, they are absolved of liability because it was not they, but successor counsel Jacquette, who caused Plaintiff's damages. There is a threshold question, raised by Plaintiff, whether this court must apply the *Land* cases, all of which were decided at the appellate court level. Under the *Erie* doctrine, we must apply state substantive law; where the Illinois Supreme Court has not ruled on an issue, decisions of the Illinois appellate courts control. *Allen v. Transamerica Ins. Co.*, 128 F.3d 462, 466 (7th Cir. 1997). However, if there is a conflict among the appellate courts or other persuasive indications that the Illinois Supreme Court would not follow the rulings of the appellate courts, we must attempt to predict how the Illinois Supreme Court would decide the issue. *Id.*; *Allstate Ins. Co. v. Westinghouse Elec. Corp.*, 68 F. Supp.2d 983, 986-87 (N.D. Ill. 1999).

Plaintiff argues that the Illinois Supreme Court would reject *Land* and its progeny, and would instead follow *Lopez v. Clifford Law Offices*, 841 N.E.2d 465 (Ill. App. Ct. 2005), which Plaintiff reads as a rejection of the liability-shifting rule adopted in *Land*. We do not agree with Plaintiff that *Lopez* is in conflict with *Land*; instead we find these case wholly consistent. In

14

*Lopez*, the plaintiff consulted an attorney regarding a proposed wrongful death suit. The attorney

misadvised him that a two-year statute of limitations applied to his lawsuit, when in fact the

statute of limitations was one year. Before a complaint was filed, the first attorney ceased his

representation. Plaintiff then retained another attorney, but believing he had two years during

which to file a complaint, he delayed some months in obtaining new counsel. By the time he

retained the second attorney, the one-year statute of limitations had run. Plaintiff then brought a

legal malpractice action against the first attorney based on his negligent advice. *Id.* at 468-69.

The *Lopez* court found the *Land* cases distinguishable for a key reason, specifically,

successor counsel was not retained until "after the expiration of the statute of limitations, *i.e.*,

when the successor counsel could not have cured the problem created by the incorrect advice." *Id.*

at 476. Thus, the first attorney could not be absolved of liability as a matter of law; instead, the

issue of proximate cause would have to be decided by the trier of fact. *Id.* at 476. The court noted

that one California court had concluded that in cases involving successive representation, the issue

of proximate cause must always be decided by the jury. *See id.* (citing *Cline v. Watkins*, 135 Cal.

Rptr. 838 (Cal. App. 1977).) While recognizing this approach, the *Lopez* court found it

unnecessary to "reexamine the rationale underlying the holdings in *Land* and *Mitchell* . . . since in

this case no successor was retained before the statute of limitations actually ran." *Lopez*, 841

N.E.2d at 476. Plainly stated, we find nothing in *Lopez* that conflicts with *Land*.

Moreover, assuming there were a conflict among the Illinois appellate courts, we would

have little difficulty predicting that the Illinois Supreme Court would follow the *Land* cases,

which simply apply an ordinary causation principle that is applicable to all negligence cases:

Where there are successive negligent actors, the negligence of the second actor, under certain

15

circumstances, may be deemed a superseding cause, which relieves the original negligent actor of liability. *See Lopez*, 841 N.E.2d at 475. Under Illinois law, "superseding cause" means the act of a third person or other force which, by its intervention, breaks the causal relationship between the original wrongdoer and the plaintiff's injury. *Abrams*, 811 N.E.2d at 676; *Wehmeier v. UNR Indus., Inc.*, 572 N.E.2d 320, 338 (Ill. App. Ct. 1991). When the causal connection is broken, the independent act of the third person or force becomes the proximate cause of plaintiff's injury. *Abrams*, 811 N.E.2d at 676.

In the *Land* cases, the original attorney avoided liability because it could not be shown that his negligence proximately caused the plaintiff's loss. The involvement of a successor attorney at the point where harm to the client's cause of action could have been completely averted extinguished the cause of action against the original attorney. Instead, the successor attorney's own actions had proximately caused the plaintiff's damages. *See Land*, 478 N.E.2d at 1205 (second attorney could have averted involuntary dismissal by taking a voluntary nonsuit and refiling the action within one year); *Mitchell*, 773 N.E.2d at 1193 (second attorney had absolute right to reinstate case that was dismissed for want of prosecution within two years but failed to do so through inadvertence).

For the same reason we believe the Illinois Supreme Court would follow the *Land* cases, we conclude that these cases do not absolve Defendants of liability as a matter of law. The *Land* cases represent an exception to the rule that proximate cause must be determined by the jury, because in those cases the plaintiff could not establish that the first attorney had proximately caused her injury. Not all cases are so clear-cut. As the Seventh Circuit has held, "Illinois law recognizes that a prior attorney's negligence may be the proximate cause of a plaintiff's damages

16

where the plaintiff's underlying claim is no longer viable when his representation ends."

*Mihailovich*, 359 F.3d at 905. Where the viability of a plaintiff's claim following discharge of the

first attorney is in dispute, summary judgment is not appropriate. As the *Mitchell* court explained:

> [T]here may be circumstances where the first attorney could be held to
> be a proximate cause of plaintiff's damages where his acts or omissions
> leave doubt about the subsequent viability of plaintiff's claims after his
> representation ends. . . . In those cases, it would be for the jury to
> determine whether the case was in fact reasonably 'viable' at the time
> of the discharge. Reasonable minds could differ as to whether the first
> attorney's actions or omissions were a proximate cause of plaintiff's
> injury.

*Mitchell*, 773 N.E.2d at 1194-95; *see also Mihailovich v. Laatsch*, No. 99 C 4780, 2001 WL

969072 at *5 (N.D. Ill. Aug. 23, 2001) (distinguishing *Land* and denying summary judgment

where reasonable jury could conclude that plaintiff's case was no longer "viable" when original

attorney ceased representation).

The question here, whether Plaintiff's claim to her share of the marital assets was still

"reasonably viable" at the time Defendants ceased their representation, is a matter on which

reasonable minds could differ. *See Mitchell*, 773 N.E.2d at 1194-95. The evidence shows that

by the time Jacquette entered the case, most of Hamed's bank accounts had already been

dissipated. Defendant Manassa argues that Jacquette's presence in the case when Hamed was

still within the United States—and could have been jailed for contempt—is itself enough to

relieve him of liability. (*See* R. 92, Def. Manassa's Reply in Supp. of Mot. for Summ. J. at 7-

11.) He relies on the testimony of Plaintiff's expert, Benjamin P. Hyink ("Hyink"), to support

this argument. (*Id.*) Hyink did not testify, as Defendant Manassa suggests, that jailing Hamed

for contempt would have automatically resulted in the return of the money he sent to Egypt; his

testimony was that jailing Hamed was a method of "hopefully compelling him to return assets to the United States." (R. 55, Def. Gurewitz's Facts, Ex. K (Hyink's Dep. Tr.) at 56.) It is apparent from Hyink's testimony that the return of the funds was not a foregone conclusion simply because Hamed remained in the United States after the Defendants' representation ended. (*See id.* at 22, 157-59, 170-71, 199.) Indeed, as Hyink pointed out, even if successor counsel had succeeded in having Hamed jailed, Hamed could have simply opted to sit in jail rather than restore the funds. (*Id.* at 182 ("He might still be in jail if he were put in jail. The assets would still be outside the jurisdiction.").) We therefore do not find this argument persuasive.

Defendant Gurewitz goes a step further by arguing that Jacquette herself was negligent in failing to remedy the harm caused by Defendants' alleged omissions, and must therefore be deemed a superseding cause of Plaintiff's injuries. In making this argument, Defendant Gurewitz relies on the testimony of Plaintiff's expert, Hyink.[7] We again find the matter one on which reasonable minds could differ. *Dugan v. Sears, Roebuck & Co.*, 454 N.E.2d 64, 67 (Ill. App. Ct. 1983) ("If different minds might reasonably draw different inferences from the facts given, then the court must defer to the judgment of the jury on the accompanying issues of foreseeability and the effect of an intervening cause."); *see also Hooper v. Cook County*, 851 N.E.2d 663, 669 (Ill. App. Ct. 2006) (whether a party was negligent is ordinarily a factual determination to be made by the jury).

The evidence before us shows that the same day Jacquette filed her appearance, she filed

---

[7] Although Defendant Gurewitz has his own expert in the case, Charles Fleck, he did not ask Fleck to offer an opinion regarding Jacquette's negligence because, in his view, "Plaintiff's own expert had already proven a case for professional negligence against Jacquette." (R. 88, Def. Gurewitz's Reply in Supp. of Mot. for Summ. J. at 4 n.2.)

18

an emergency motion requesting that Hamed's bank accounts be frozen. She provided the court with documentation of at least one wire-transfer made to Egypt in violation of the court's November 2003 order. She also sought the surrender of Hamed's passport and requested that he be jailed for contempt. While Hyink expressed the view that Jacquette's emergency motion could have been better drafted, he repeatedly emphasized that he did not analyze Jacquette's actions in detail and could offer no opinion about whether her representation was deficient. ((R. 55, Def. Gurewitz's Facts, Ex. K (Hyink's Dep. Tr.) at 171-74, 182-83, 187-88, 192.) He further pointed out, "[Jacquette] did take some steps. She did act and made extensive efforts to control [Hamed's] physical being." (*Id.* at 182.) Hyink noted that the effectiveness of Jacquette's actions was "limited because of the assets not being in the jurisdiction" by the time she entered the case, which, in his view, was a result of Defendants' lack of diligence. (*Id.* at 180.) Hyink also testified that trying to force the return of the assets was "not as easy or as certain as getting an injunction barring the transfer of assets" in the first place. (*Id.* at 199.) For these reasons, we find the evidence falls short of establishing as a matter of law that Jacquette was a superseding cause of Plaintiff's damages.[8]

Because reasonable minds could differ as to whether Plaintiff's claim to the marital assets

---

[8] While Plaintiff would ultimately bear the burden of proving that Defendants proximately caused her injury, Defendants would bear the burden of production with respect to their claim that a third party was the sole proximate cause of Plaintiff's injuries. "A defendant has the right not only to rebut evidence tending to show that defendant's acts are negligent and the proximate cause of claimed injuries, but also has the right to endeavor to establish by competent evidence that the conduct of a third person, or some other causative factor, is the sole proximate cause of plaintiff's injuries. . . . [I]f the evidence is sufficient, the defendant is entitled to an instruction on this theory." *Leonardi v. Loyola Univ. of Chicago* 658 N.E.2d 450, 459 (Ill. 1995). We note further that under Illinois law there may be more than one proximate cause of an injury. *See id.* at 455 ("A person who is guilty of negligence cannot avoid responsibility merely because another person is guilty of negligence that contributed to the same injury.").

19

was "reasonably viable" when Defendants ceased their representation, and whether Jacquette was a superseding cause of Plaintiff's injury, the matter must be decided by a jury. Accordingly, we decline to grant summary judgment to Defendants.

### B. Whether The Acts of Hamed Seleman Were Unforeseeable

Next, Defendant Manassa argues, and Defendant Gurewitz joins him in arguing, that Hamed's actions were unforeseeable as a matter of law. Foreseeability is a subset of the proximate cause determination; the inquiry is whether the plaintiff's injury is of a type that a reasonable person in the defendant's situation would see as a likely result of his conduct. This is ordinarily a question for the jury. *Young*, 821 N.E.2d at 1086. Foreseeability may be decided by the court as a matter of law where the issue is so clear that reasonable minds could not differ. *Id.* For instance, in *Pacelli v. Kloppenberg*, 382 N.E.2d 570, 571 (Ill. App. Ct. 1978), relied on by Defendants, the court found that an attorney could not be held liable for failing to protect the plaintiff from the actions of a licensed real estate broker, who stole money the plaintiff had deposited into an escrow account. The court found "nothing in the record to suggest that defendant had any reason to question the honesty" of the broker, who was himself the plaintiff's fiduciary. *Id.* at 571. In considering the foreseeability of the broker's actions, the court concluded, "Duty is imposed not on the mere possibility of occurrence, but on what the reasonably prudent man would then have foreseen as likely to happen." *Id.*

To the extent Defendants believe *Pacelli* stands for the principle that a defendant can never be held liable for the criminal acts of a third party, such a definitive rule has in recent years given way to a case-by-case analysis of whether the third party's criminal acts were foreseeable. *See Bourgonje v. Machev,* 841 N.E.2d 96, 117 (Ill. App. Ct. 2005) ("While at one time criminal

acts were presumed unforeseeable, the law has developed to recognize that criminal acts may become foreseeable in a variety of circumstances . . . ."). In this case, unlike in *Pacelli*, there is evidence from which a reasonable jury could conclude that Hamed's actions were foreseeable. As a general matter, we do not find it entirely unforeseeable that a spouse would dissipate or abscond with marital assets during the course of a divorce proceeding. *See generally In re Marriage of Schmitt*, 747 N.E.2d 524 (Ill. App. Ct. 2001) (trial court properly granted temporary restraining order where there was a risk husband would dissipate marital assets); *In re Marriage of Gurda*, 711 N.E.2d 339 (Ill. App. Ct. 1999) (husband improperly dissipated marital assets); *In re Marriage of Toth*, 586 N.E.2d 436 (Ill. App. Ct. 1992) (both spouses improperly dissipated marital assets). Indeed, the Illinois Marriage and Dissolution of Marriage Act ("IMDMA"), 750 ILCS 5/101 *et seq.*, provides various remedies, such as freezing bank accounts and prohibiting the sale of assets without a court order, precisely because it is not unusual that a spouse might appropriate marital assets before they can be divided by the court. *See* 750 ILCS 5/501(a)(2)(I).

Additionally, while the matter is disputed, Plaintiff testified that she informed both attorneys about her concerns Hamed would dissipate the marital assets. (R. 55, Def. Gurewitz's Facts, Ex. G (Sobilo's Dep. Tr.) at 212-14, 219-20.) Hamed's history of dissipating assets is also reflected in the pleadings drafted by Defendant Manassa in both the 2002 and 2003 cases (which would have been apparent to Defendant Gurewitz upon his review of the file), and in the petition for temporary relief filed by Defendant Gurewitz in the 2003 case. (R. 61, Def. Manassa's Facts, Ex. D (2002 Petition) ¶ 18 & Ex. G (2003 Petition) ¶ 18; R. 61, Def. Manassa's Facts, Ex. N (Petition for Temporary Relief) at ¶ 12.) Plaintiff's expert opined that given Hamed's history, Defendants should have recognized the risks and taken greater steps to independently investigate

21

Hamed's finances and prevent his dissipation of the marital assets. (R. 55, Def. Gurewitz's Facts, Ex. J (Hyink's Report) at 20-25.) Thus, we reject Defendants' argument that Hamed's actions were unforeseeable as a matter of law.[9]

## II.    Actual Damages

### A.    Whether There Is Evidence Plaintiff Would Have Been Entitled to Any of The Assets That Hamed Dissipated

Next, Defendant Manassa argues, and Defendant Gurewitz joins him in arguing, "There is no evidence that Sobilo suffered actual damages" as a result of their alleged negligence. (R. 66, Def. Manassa's Mem. in Supp. of Mot. for Summ. J. at 10.) Defendants are correct that Plaintiff must prove actual damages to recover for legal malpractice. *See Mihailovich*, 359 F.3d at 904-05. The plaintiff in a malpractice case must essentially prove a "case within a case" by showing that her attorney was negligent and, additionally, that absent the attorney's negligence she would have prevailed in the underlying litigation. *Id.*; *Klump v. Duffus*, 71 F.3d 1368, 1373 (7th Cir. 1996). Defendants argue that Plaintiff cannot demonstrate actual damages because: (1) there is no evidence that any of the money Hamed wire-transferred to Egypt constituted marital assets; and (2) there is no evidence that Plaintiff would have been awarded any of this money in the divorce.

Under the IMDMA, all property acquired during the marriage is presumed to be marital unless it falls under an enumerated category, such as property acquired by gift or legacy to one spouse. *See* 750 ILCS 5/503(a). The statute creates a rebuttable presumption that property

---

[9] We note that Defendant Gurewitz has adopted Defendant Manassa's foreseeability argument without any analysis of how the facts specifically pertaining to him demonstrate that he could not have foreseen Hamed's actions. (R. 53, Def. Gurewitz's Mem. in Supp. of Mot. for Summ. J. at 15.) Finding no such analysis, we reject his argument for the same reasons.

acquired during the marriage is marital, regardless of how title is held. 750 ILCS 5/503(b); *In re Marriage of Wanstreet*, 847 N.E.2d 716, 721 (Ill. App. Ct. 2006). The burden is on the spouse claiming that a piece of property is not marital to prove by clear and convincing evidence that the property sought to be excluded falls under one of the statutory exceptions. *Id.* § 503(b); *Wanstreet*, 847 N.E.2d at 721. Any doubt as to the nature of the property is resolved in favor of finding that the property is marital. *Berger v. Berger*, 829 N.E.2d 879, 887 (Ill. App. Ct. 2005).

Although numerous fact disputes remain regarding the marital assets, there is evidence in the record from which a reasonable jury could find the following: during the marriage, Hamed was the breadwinner of the family and Plaintiff was a homemaker; during the marriage Hamed acquired several pieces of real property and started several businesses; Hamed disposed of several assets immediately prior to and during the 2003 divorce proceeding; Hamed made numerous wire-transfers to Egypt prior to and during the pendency of the 2003 case, including from bank accounts held in the name of his businesses. (*See* pages 2-8, *supra*.) Given the strong presumption in favor of classifying property as marital, we find it highly unlikely that *none* of the properties, businesses, or funds held in Hamed's bank accounts constituted marital property.

Likewise, a reasonable jury could find that Plaintiff would have been awarded some of these assets in the divorce. Indeed, the divorce court awarded Plaintiff sole rights to the Nefertiti Café, along with approximately $750,000 in wire-transferred funds, reflecting the court's view that Plaintiff was entitled to these assets under the IMDMA. (R. 61, Def. Manassa's Facts, Ex. K (Divorce Judgment) at 7.) Plaintiff's expert opined that the court took the view that since it was impossible to ascertain the full extent of the marital estate due to Hamed's extensive subterfuge, awarding these assets to Plaintiff was a fair division of the property. (R. 55, Def. Gurewitz's

23

Facts, Ex. K (Hyink's Dep. Tr.) at 25.) Plaintiff's expert also opined that Plaintiff would have been entitled to at least 50 percent of all additional marital assets had they not been dissipated. (R. 55, Def. Gurewitz's Facts, Ex. J (Hyink's Report) at 18.)

Because we find evidence from which a jury could conclude that at least some of the assets Hamed dissipated constituted marital assets, and that Plaintiff was entitled to at least a portion of these assets in the divorce, we decline to grant summary judgment on this ground.

### B. Whether Plaintiff Has Failed To Prove That The Underlying Judgment "Was or Is" Collectible

Next, Defendant Gurewitz argues, and Defendant Manassa joins him in arguing, that Plaintiff's malpractice claim fails because she cannot demonstrate the underlying divorce judgment "was or is" collectible. (R. 53, Def. Gurewitz's Mem. in Supp. of Mot. for Summ. J. at 9.) Defendants are correct that Plaintiff must prove she would have recovered in the underlying action to succeed on her malpractice claim. As the Seventh Circuit has explained, "In a malpractice action, a plaintiff's 'actual injury' is measured by the amount of money she would have actually *collected* had her attorney not been negligent." *Klump*, 71 F.3d at 1374 (emphasis in original). Awarding damages above that which the plaintiff could have actually collected in the underlying suit would result in a "windfall" to the plaintiff. *Id.* In other words, if the plaintiff could not have collected a full judgment from the defendant in the underlying case, the attorney's negligence did not injure her in that amount: "[S]he simply could not lose what she could never have had." *Id.* at 1375; *see also Bloome v. Wiseman, Shaikewitz, McGivern, Wahl, Flavin & Hesi, P.C.*, 664 N.E.2d 1125, 1131 (Ill. App. Ct. 1996) ("The legal malpractice action places the plaintiff in the same position he or she would have occupied but for the attorney's

24

negligence. . . . The link exists to ensure that the plaintiff is in no better position by bringing suit against the attorney than if the underlying action against the third-party tortfeasor had been successfully prosecuted.").

Defendants argue that Plaintiff cannot establish collectibility of the underlying judgment because "[b]y her own testimony (and thus a fact not in dispute), she was and still is unable to collect one single cent of it." (R. 53, Def. Gurewitz's Mem. in Supp. of Mot. for Summ. J. at 9.) We find this argument unpersuasive. Plaintiff claims that she has been unable to collect the divorce judgment *because* Defendants were negligent in failing to take adequate steps to preserve the marital estate so that she could obtain her share of it in the divorce. What she would have collected in the divorce absent the Defendants' negligence is the appropriate measure of her damages.[10] *See Klump*, 71 F.3d at 1374 (under Illinois law "plaintiff's 'actual injury' is measured by the amount of money she would have actually collected *had her attorney not been negligent*") (emphasis added).

---

[10] Plaintiff argues that the issue is whether she can prove Hamed was "solvent" at the time of the 2003 proceeding, not whether the underlying judgment is collectible. (R. 78, Pl.'s Resp. to Def. Gurewitz's Mot. for Summ. J. at 9-11.) Plaintiff is correct that some courts have discussed solvency in lieu of collectibility. *See Bloome*, 664 N.E.2d at 1131; *Goldzier v. Poole*, 82 Ill. App. 469 (Ill. App. Ct. 1899). We do not see a conflict in the law as Plaintiff does, however; we believe this to be simply different ways of characterizing the same inquiry, namely, whether the plaintiff would have actually *recovered* in the underlying litigation. The type of proof required to satisfy this element will differ from case to case. *Bloome*, 664 N.E.2d at 1131. Regardless of the terminology used, the central issue is whether the plaintiff's recovery in the underlying litigation "could in part or in whole have been realized had the attorney not been negligent." *Id.* (citing *Goldzier*, 82 Ill. App. at 472). This will be Plaintiff's burden to prove at trial. *Klump*, 71 F.3d at 1374 (plaintiff bears the burden of proving "the amount she would have actually collected from the tortfeasor as an element of her malpractice claim"). In regards to solvency, we note that the evidence before us indicates that Hamed was solvent at the time of the 2003 proceeding. *See Bloome*, 664 N.E.2d at 1131 (finding underlying defendant was solvent because he had the ability to generate income).

Defendants's reliance on *Sheppard v. Krol*, 578 N.E.2d 212 (Ill. App. Ct. 1991) does not change our conclusion. In *Sheppard*, the lack of information about who had manufactured a forklift, the product at issue in the plaintiff's underlying products liability suit, made it wholly speculative whether and to what extent plaintiff would have recovered in the underlying suit. The plaintiff nonetheless argued that he should be allowed to seek compensation against his attorney "for the loss of any chance he had to recover" in the underlying case. *Sheppard*, 578 N.E.2d at 217. The court disagreed, observing that "our legal system does not permit liability based on conjecture." *Id.* Here, Plaintiff is not seeking conjectural damages for the loss of "any chance" she had to recover in the divorce case. Rather, she seeks to recover her share of the marital assets which she claims were lost due to Defendants' negligence. While the full extent of the marital estate may never be known because of Hamed's deception,[11] Plaintiff could recover her share of the *known* marital assets if she can prove that Defendants were negligent. *See Klump*, 71 F.3d at 1374. Accordingly, we decline to grant summary judgment on this ground.

## III.    The Defendants' Remaining Arguments

We turn now to the separate arguments raised by Defendant Manassa and Defendant Gurewitz, respectively.

### A.    Whether Defendant Manassa "did not have any evidence that would allow him to obtain a TRO stopping Seleman from transferring money to Egypt"

Defendant Manassa argues that he is entitled to summary judgment because "there is no proof Manassa could have obtained a temporary restraining order (TRO) stopping Seleman from

---

[11] For instance, Plaintiff's damages expert, Jerome Lipman, has revealed evidence suggesting that Hamed may have had foreign bank accounts and a business relationship with a Canadian company that deals with offshore transactions and investments. (R. 55, Def. Gurewitz's Facts, Ex. Q (Lipman's Report) at 7.)

transferring funds." (R. 66, Def. Manassa's Memo. in Supp. of Mot. for Summ. J. at 6.) The gist of Defendant Manassa's argument is that, even though there is considerable evidence Plaintiff informed him of her concerns about Hamed's dissipation of assets prior to the 2002 case, the circumstances were entirely changed by the time of the 2003 proceeding. He asserts, "Sobilo informed Manassa that she was no longer concerned that Seleman was dissipating funds from the marital estate or that he would flee the country with their children." (R. 77, Pl.'s Resp. to Def. Manassa's Facts ¶ 18.) Whether Plaintiff made this statement is one of the many factual disputes that exist in this case. (Id.; R. 55., Def. Gurewitz's Facts, Ex. G (Sobilo Dep. Tr.) at 49, 149-50, 210-14, 220.)

There is also a dispute as to whether a competent attorney would simply rely on his client's assessment of the risk that her spouse might dissipate or abscond with assets. Plaintiff's expert, Hyink, opined that Defendant Manassa should have conducted his own investigation of Hamed's finances. (See R. 55, Def. Gurewitz's Facts, Ex. J (Hyink's Report) at 20-26.) Had he done so he would have discovered substantial evidence of Hamed's dissipation of assets. (R. 55, Def. Gurewitz's Facts, Ex. J (Hyink's Report) at 22-23, Ex. K (Hyink's Dep. Tr.) at 35-36, 167-68.) Hyink also opined that the November 2003 order entered by agreement of Defendant Manassa was "very poor, poorly drawn and not a proper approach to this kind of situation," and that Defendant Manassa should have sought a TRO specifically freezing Hamed's accounts. (R. 55, Def. Gurewitz's Facts, Ex. K (Hyink Dep. Tr.) at 36, 167-68).

Even if there was no dispute as to the underlying facts, Defendant Manassa's view that he no longer had any reason to suspect that Hamed might dissipate or abscond with assets is but one inference that can be taken from the facts. Another inference, representing Plaintiff's view, is

27

that even though Hamed had returned some of their assets to a joint account, the 2003 proceeding was merely a continuation of the 2002 proceeding presenting all the same issues, including that Hamed might dissipate or abscond with marital assets. (*See* R. 55, Def. Gurewitz's Facts, Ex. G (Sobilo Dep. Tr.) at 49, 210-223.) There is evidence supporting Plaintiff's view, including Defendant Manassa's testimony that he did not require her to fill out a new client intake sheet when she contacted him about filing the 2003 petition; instead, he simply worked off the intake sheet prepared with respect to the 2002 case, adding some notes, including that Hamed had recently purchased a condominium in Egypt. (R. 61, Def. Manassa's Facts, Ex. C (Manassa Dep. Tr.) at 21.)

Whether Plaintiff's or Defendant Manassa's view should prevail is not a matter that can be decided here, since making a choice among reasonable inferences is a function of the fact-finder. *See Harley-Davidson Motor Co.*, 319 F.3d at 989. Because there is evidence from which a reasonable jury could conclude that Defendant Manassa had a sufficient basis to move for a TRO, his motion for summary judgment is denied.

**B.    Whether Defendant Gurewitz Is Entitled To Partial Summary Judgment**

Defendant Gurewitz raises two alternative arguments in favor of partial summary judgment on certain of Plaintiff's claims.

**1.    Whether Defendant Gurewitz's Failure to Record a Lis Pendens Notice "Is Not A Proximate Cause That Allowed Hamed to Convey The Irving Park Property"**

Defendant Gurewitz first argues that his failure to record a *lis pendens* notice on the Irving Park property was not the proximate cause of Plaintiff's damages with respect to the

property. *Lis pendens*, in plain terms, means "pending suit." *Admiral Builders Corp. v. Robert Hall Vill.*, 427 N.E.2d 1032, 1035 (Ill. App. Ct. 1981). The Illinois *lis pendens* statute provides that when a lawsuit is pending involving a piece of real property, the filing of a *lis pendens* notice with the recorder of deeds constitutes constructive notice of the lawsuit to any person who subsequently acquires an interest in that property. 735 ILCS 5/2-1901; *City of Chicago v. Ramirez*, 852 N.E.2d 312, 322 (Ill. App. Ct. 2006). A person who acquires the property after the recording of the *lis pendens* notice takes the property subject to any superior interests that may be determined in the lawsuit. *See* 735 ILCS 5/2-1901); *Ramirez*, 852 N.E.2d at 322.

Defendant Gurewitz argues that his failure to register a *lis pendens* notice could not possibly have caused the loss of the Irving Park property because "a *lis pendens* notice does not act as a prophylactic to the transfer of real estate." (R. 53, Def. Gurewitz's Mem. in Supp. of Mot. for Summ. J. at 11.) As evidence for this proposition he points out that Hamed was able to convey the property to Sami M. Rageb even though Charter One Bank had recorded a Notice of Foreclosure, which he argues is the equivalent of *lis pendens* notice, prior to the sale. He also points out that even though Plaintiff, through attorney Jacquette, eventually recorded a *lis pendens* notice in October 2005, Rageb was able to convey the property four months later to an unknown third party. Therefore, Defendant Gurewitz argues, "Plaintiff cannot prove that, but for Gurewitz's negligent failure to record a *lis pendens* notice against the Irving Park Property, Hamed would not have been able to convey it." (*Id.* at 12.)

Defendant Gurewitz misses the point of the *lis pendens* statute. While a *lis pendens* notice does not give the filer a lien or act as an injunction preventing sale of the property, it "gives notice to purchasers of the land that there may be superior interests." *In re Leonard*, 125

29

F.3d 543, 545 (7th Cir. 1997). The failure to record a *lis pendens* notice will result in the loss of the property if it is sold to a "bona fide purchaser," defined as a purchaser for value who had no notice of the pending suit. *See First Midwest v. Pogge*, 687 N.E.2d 1195, 1198 (Ill. App. Ct. 1997); *Admiral Builders Corp.*, 427 N.E.2d at 1037. A purchaser cannot claim to be a bona fide purchaser if a *lis pendens* notice was filed prior to the date he or she acquired an interest in the property. *See First Midwest*, 687 N.E.2d at 1198; *see also Sec. Sav. & Loan Ass'n v. Hofmann*, 537 N.E.2d 18, 20 (Ill. App. Ct. 1989) (recording of *lis pendens* notice by wife in divorce case prevented mortgagee from claiming to be innocent purchaser and thus wife's interest was superior to mortgagee's). Conversely, if no *lis pendens* notice is filed, and the subsequent purchaser did not otherwise have notice of the pending suit, he takes the property free of any interest determined in the suit.[12] *See First Midwest*, 687 N.E.2d at 1198.

Thus, although the sale of the Irving Park property may not have been prevented if Defendant Gurewitz had filed a *lis pendens* notice, the absence of a *lis pendens* notice will make it more difficult for Plaintiff to assert her interest in the property against subsequent purchasers. Moreover, in Hyink's view, the recording of a *lis pendens* by Defendants might have made it less likely that Hamed would have fled the jurisdiction, since he would have had less ability to liquidate his assets. (R. 55, Def. Gurewitz's Facts, Ex. K (Hyink's Dep. Tr.) at 66-67.) Hyink also suggested that the existence of a *lis pendens* notice might have made the property less attractive to potential buyers and thus, in an indirect way, hampered the sale of the property. (R.

---

[12] Contrary to Defendant Gurewitz's suggestion, the Illinois Uniform Fraudulent Transfer Act ("UFTA"), 740 ILCS 160/1 *et. seq.*, does not provide an automatic remedy for Plaintiff. (R. 88, Def. Gurewitz's Reply in Supp. of Mot. for Summ. J. at 11.) Under the UFTA, Plaintiff could not void a transfer made to a bona fide purchaser. 740 ILCS 160/9; *Kennedy v. Four Boys Labor Serv., Inc.*, 664 N.E.2d 1088, 1093 (Ill. App. Ct. 1996).

55, Def. Gurewitz's Facts, Ex. K. (Hyink's Dep. Tr.) at 80-83.) We therefore find evidence from

which a reasonable jury could conclude that Defendant Gurewitz's failure to file a *lis pendens*

notice was a proximate cause of some of Plaintiff's alleged damages with respect to the Irving

Park property, precluding summary judgment on this claim.

### 2. Whether Defendant Gurewitz Lacked A Duty To Prevent Wire Transfers Occurring Prior to January 16, 2004

Defendant Gurewitz's final argument is that he had "no duty to prevent" any wire

transfers that were made prior to January 16, 2004, the date on which he and Plaintiff executed a

retainer agreement.[13] While Defendant Gurewitz had no duty, or even any ability, to *prevent*

wire-transfers that occurred prior to his representation, we find evidence in the record from

which a reasonable jury could conclude that Defendant Gurewitz's negligence was a proximate

cause of Plaintiff's injury with respect to these funds. Specifically, Plaintiff's expert opined that

Defendant Gurewitz breached the standard of care in failing to properly investigate Hamed's

finances, failing to seek an order freezing Hamed's accounts, and failing to pursue available

remedies to recoup the money that had already been wire-transferred. (R. 55, Def. Gurewitz's

Facts, Ex. J (Hyink's Report) & Ex. K (Hyink Dep Tr.) at 170-76.) According to Plaintiff's

---

[13] In a footnote, Defendant Gurewitz posits—without elaboration—that he "arguably" had no duty to undertake any action on Plaintiff's behalf until February 3, 2004, the date upon which the state court granted his motion for leave to file a substitution of counsel. (R. 53, Def. Gurewitz's Mem. In Supp. of Mot. for Summ. J. at 13 n.3.) Without any specific argument by Defendant Gurewitz as to why his duties as counsel did not arise on the date he signed a retainer agreement with Plaintiff, we decline to give the matter further consideration. We note, however, that Hyink found it "unusual" and "not very prompt" that Defendant Gurewitz waited nearly three weeks to move for substitution of counsel following his retention by Plaintiff. (R. 55, Def. Gurewitz's Facts, Ex. K (Hyink's Dep. Tr.) at 33-34.) Hyink further testified that given the exigencies of this case, Defendant Gurewitz could have filed an emergency motion for substitution of counsel immediately after being retained. (*Id.* at 34-35.)

expert, had Defendant Gurewitz taken these steps, the previously transferred assets might have been restored.[14] For these reasons, we decline to grant partial summary judgment to Defendant Gurewitz.

## DEFENDANT MANASSA'S MOTION TO STRIKE

Finally, Defendant Manassa moves to strike Plaintiff's affidavit submitted in opposition to his summary judgment motion, arguing that it improperly contradicts various portions of her sworn deposition testimony. (R. 93, Def. Manassa's Mot. to Strike.) The Court has discretion in deciding whether to strike the affidavit. *Adusumilli v. City of Chicago*, 164 F.3d 353, 359 (7th Cir. 1998).

Defendant Manassa first takes issue with Paragraph 2 of the affidavit, in which Plaintiff states: "I told all my attorneys that represented me in my divorce, including Manassa when he filed the 2003 divorce case . . . that I feared Hamed would dissipate marital assets and potentially abscond." (R. 77, Pl.'s Resp. to Def. Manassa's Facts, Ex. 6 (Pl.'s Aff.) at ¶ 2.) Defendant Manassa points to various portions of Plaintiff's testimony that he claims contradicts this statement, including her testimony that she did not recall whether she had a face-to-face meeting with Defendant Manassa prior to his filing of the 2003 case, and that she could not recall if she specifically informed Defendant Manassa of her fear that Hamed would abscond before the filing

---

[14] We note additionally that Defendant Gurewitz's liability is not necessarily limited to the $250,000 transferred during the time he was Plaintiff's counsel. As Plaintiff's expert pointed out, when Defendant Gurewitz began his representation there was more than $400,000 in assets still within the United States. Plaintiff's expert opined that had Defendant Gurewitz acted diligently by properly investigating Hamed's finances and taking appropriate steps to prevent the transfer of funds, all of that money would have remained within the divorce court's jurisdiction. (R. 55, Def. Gurewitz's Facts, Ex. K (Hyink's Dep. Tr.) at 59-60.)

32

of the 2003 case. (R. 93, Def. Manassa's Mot. to Strike at 2-3.) As we read it, Plaintiff's

deposition testimony was that she was unsure about whether she had a formal meeting with

Defendant Manassa prior to the filing of the 2003 case, not whether she conveyed to him her

continuing belief that Hamed might dissipate the marital assets. (*See* R. 55, Def. Gurewitz's

Facts, Ex. G (Sobilo's Dep. Tr.) at 213-14, 219-20). At other points in her testimony, she

testified that she did convey her fears to Defendant Manassa about Hamed dissipating assets

during the 2003 case. (*Id.* at 213-14, 200, 220) We note additionally that the testimony cited by

Defendant Manassa pertains only to Hamed absconding; it states nothing about whether Plaintiff

recalled telling Defendant Manassa about her fear that Hamed would dissipate assets. Further,

Defendant Manassa's own testimony suggests that the two may have had discussions about

Hamed's potential to abscond at some point during the 2003 case, even if they did not have a

formal discussion on that topic prior to the filing of the case. (*See* R. 61, Def. Manassa's Facts,

Ex. C (Manassa's Dep. Tr.) at 102.) To the extent there are ambiguities in the deposition

testimony, we believe this a matter best sorted out by the jury. *Szymanski v. Rite-Way Lawn

Maint. Co., Inc.*, 231 F.3d 360, 365-66 (7th Cir. 2000) (inconsistencies within deposition

testimony and affidavit were "best left to a jury making a credibility determination.").

Assuming there is some conflict between Plaintiff's deposition testimony and her

affidavit, the proper course is for us to simply disregard the affidavit. *Pourghoraishi v. Flying J.,

Inc.*, 449 F.3d 751, 759 (7th Cir. 2006); *Piscione v. Ernst & Young, LLP*, 171 F.3d 527, 532-33

(7th Cir. 1999). We have found no need to rely on Plaintiff's assertion in Paragraph 2 because,

as discussed in Sections I and III above, we have found other evidence creating a fact issue as to

what Defendants knew or should have known regarding the likelihood that Hamed would

dissipate the marital assets. Thus, we decline to strike Paragraph 2.

Defendant Manassa also takes issue with Paragraphs 4 and 15 of the affidavit, in which Plaintiff attests that the funds Hamed wire-transferred to Egypt constituted marital assets, and that three transfers made in 2003 came from a certificate of deposit held at Foster Bank. (R. 77, Pl.'s Resp. to Def. Manassa's Facts, Ex. 6 (Pl.'s Aff.) at ¶¶ 4, 15.) At her deposition Plaintiff indicated that she did not know the exact source of the wire-transferred funds because they were still being traced. (*See* R. 55, Def. Gurewitz's Facts, Ex. G (Sobilo's Dep. Tr.) at 209-11, 228.)

We do not see an inherent conflict in the two documents, as it is clear from the record that the source of the wire-transferred funds is a complex matter which has been under investigation during this litigation. Plaintiff's damages expert, Jerome Lipman, has poured through Hamed's bank accounts and business records in an attempt to discern the source of the wire-transferred funds, and has discovered a tangled web of deposits, withdrawals, and wire-transfers made from Hamed's numerous accounts. (*See* R. 55, Def. Gurewitz's Facts, Ex. Q (Lipman's Report).) Nevertheless, assuming there is a conflict between the affidavit and deposition testimony, we have not relied on Paragraphs 4 and 15 of Plaintiff's affidavit in determining whether there are fact disputes that preclude summary judgment. *See Pourghoraishi*, 449 F.3d at 759. As discussed in Section II above, we have found other evidence in the record apart from the affidavit creating a fact dispute regarding Plaintiff's actual damages. For these reasons, we decline to strike these paragraphs.

## CONCLUSION

For the reasons set forth above, Defendant Manassa's motion for summary judgment (R. 64) is denied, and Defendant Gurewitz's motion for summary judgment (R. 51) is denied.

Defendant Manassa's motion to strike (R. 93) is also denied.

The parties are directed to reevaluate their settlement positions in light of this ruling and undertake new efforts to settle this case. A status hearing will be held in open court on **April 10, 2007** at **9:45 a.m.**, at which time counsel shall be prepared to report on the status of settlement discussions and, if necessary, provide a proposed date for the trial of this matter. Finally, if this matter will proceed to trial, the parties are directed to reevaluate their respective motions in limine in light of this opinion.

**ENTERED:** _____

                  **Judge Ruben Castillo**
                  **United States District Court**

**Dated:** March 16, 2007